**CASE NO. 09-2245**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

PULTE HOMES, INC.,

        Plaintiff-Appellant,

v.

LABORERS' INTERNATIONAL
UNION OF NORTH AMERICA;
TERENCE M. O'SULLIVAN; RANDY
MAYHEW,

        Defendants-Appellees.

On Appeal from the United States District Court
For the Eastern District of Michigan, Southern Division
Case No. 2:09-cv-13638, Honorable Lawrence P. Zatkoff

## CORRECTED OPPOSITION BRIEF OF DEFENDANTS-APPELLEES

LANKFORD & REED, PLLC
TERRANCE G. REED
120 N. St. Asaph Street
Alexandria, VA 22314
(703) 299-5000

MARTENS, ICE, KLASS, LEGGHIO &
ISRAEL, P.C.
CHRISTOPHER P. LEGGHIO
306 South Washington Avenue, Suite 600
Royal Oak, MI 48067-3837
(248) 398-5900

Counsel For Defendants-Appellees

# TABLE OF CONTENTS

Table of Authorities.................................................................iii

Statement of Issues
Presented..........................................................................1

Standards of Review............................................................2

CounterStatement of
Facts..................................................................................2

Summary of
Argument...........................................................................8

Argument............................................................................9

    I . The District Court Did Not Abuse Its Discretion in Concluding
    That the Norris-LaGuardia Act Compelled Denial of Plaintiff's
    Request for Relief..........................................................9

        A. The Norris-LaGuardia Act Applies to the Conduct at
        Issue.......................................................................10

            1. The District Court Did Not Clearly Err in Finding That the
            Activity at Issue Involves or Grows Out of a Labor
            Dispute................................................................11

            2. The Act's Anti-Injunction Provisions Apply to This Labor
            Dispute................................................................14

            3. The District Court Did Not Clearly Err in Finding that the
            Activity Falls Within the Act's Immunity Provisions for
            Publicizing a Labor Dispute and for Peaceful
            Assembly..............................................................17

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 2

      a. **Pulte Has Not Demonstrated that the District Court's Application of the Publicity Subsection Is Clearly Erroneous**................................18

      b. **Pulte Has Not Demonstrated that the District Court's Application of the Assembly Subsection is Clearly Erroneous** ...........................................19

      c. **Plaintiff Failed to Allege or to Prove Fraud or Violence by the Defendants To Exempt This Case From the Act's Protection of Publicizing a Labor Dispute**..............................................32

    4. **Alleged Unlawful Conduct is Not An Exception to the Applicable Act Subsections**.............................36

    5. **There is No Allegation Or Clear and Convincing Proof That Any Defendant Committed, Authorized, or Ratified Any Violent or Fraudulent Act**...............................47

II.    **Even if Section 107 of the Act Applied, Pulte Has Not Met Its Heavy Burden to Justify Injunctive Relief Thereunder**.......................................................50

   A. **Plaintiff is Not Likely to Succeed on its CFAA Claim**...............................................................51

   B. **Plaintiff is Not Likely to Succeed on its State Law Claims**................................................................54

   C. **The Remaining Factors Favor Denial of Equitable Relief**................................................................55

   D. **Pulte Has Not Met Its Statutory Burden of Exhausting Every Reasonable Effort to Settle Prior to Seeking Injunctive Relief**................................................................56

**III.     The Labor Dispute Activity At Issue is Subject to Labor Preemption**…………………………………………………58

**IV.     The Application of Section 1030 to Criminalize Constitutionally Protected Labor Speech Renders it Substantially Overbroad and Invalid**………………………………………………63

**V.     The Labor Activity At Issue Is Immune from Liability Under the Norris-LaGuardia and Clayton Acts**……………………….....66

**Conclusion**………………………………………………… ..68

# TABLE OF AUTHORITIES

## CASES

Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.,
    280 F.3d 619 (6th Cir. 2002). ……………………………………..…….……2

Alexander v. United States, 509 U.S. 544 (1993)…………………………..……..64

Allied Systems Inc. v. Teamsters Nat. Auto Transporters Industry,
    179 F.3d 982 (6th Cir. 1999)…………………………………………....……16

American Bridge Div. v. Int'l Union of Operating Eng'rs,
    772 F.2d 1547 (11th Cir. 1985)…………………………………..…….……49

American Family Mutual Insurance Co. v. Rickman,
    554 F. Supp.2d 766 (N.D. Ohio)……………………………………………..54

American Trim, L.L.C. v. Oracle Corp., 383 F.3d 462 (6th Cir. 2004)………...10

Ansley v. Conseco Financial Servicing Corp.,
    2002 Mich. App. Lexis 2033 (2002)…………………………………..……54

AT&T Broadband, LLC v. Int'l Bhd. Of Elec. Workers,
    317 F.3d 758 (7th Cir. 2003)…………………………………………15, 16

Armco v. United Steelworkers of America, 280 F.3d 669 (6th Cir. 2002)………44

Barnhart v. Sigmon Coal, Co., 534 U.S. 438 (2002)……………………………37

Briggs Transportation Co. v. Int'l Brotherhood of Teamsters,
    739 F.2d 341 (8th Cir. 1984)…………………………………………46, 47

Broadrick v. Oklahoma, 413 U.S. 601 (1973)…………………………………64, 65

Brotherhood of Maintenance of Ways Employees v.
    Guilford Transportation Indus., 803 F.2d 1228 (1st Cir. 1986)……………47

Brotherhood of Railroad Trainmen v. Chicago River,
    353 U.S. 30 (1957)……………………………………………………....39, 42

Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad,
    321 U.S. 50 (1944).................................................................57

Brown v. Hotel and Restaurant Employees and Bartenders Int'l,
    468 U.S. 491 (1984)...............................................................60

Building and Constr. Trades Council v. Associated Builders &
    Contractors of Mass., 507 U.S. 218 (1993).................................61

Burlington Northern Railroad v. Brotherhood of Maintenance
    of Way Employees, 481 U.S. 429 (1987)...........................9, 13, 15

Carbon Fuel Co. v. UMW, 444 U.S. 212 (1979).............................49

Central Vermont Ry., Inc. v. Brotherhood of Maintenance
    of Way Employees, 793 F.2d 1298 (D.C. Cir. 1986)......................39

Chamber of Commerce v. Brown, 128 S. Ct. 2408 (2008).............*passim*

Citizens Against Rent Control Coalition for Fair Housing v. Berkeley,
    354 U.S. 290 (1981)...............................................................29

City Council v. Taxpayers for Vincent, 466 U.S. 789 (1984)...........65

Compuserve Inc. v. Cyber Promotions, Inc.,
    962 F. Supp. 1015 (S.D. Ohio 1997).........................................21

County Sec. Agency v. Ohio Department of Commerce,
    296 F.3d 477 (6th Cir. 2002)............................................56, 64

Diamond Power Int'l, Inc. v. Davidson,
    540 F. Supp.2d 1322 (N.D. Ga. 2007).......................................51

DeJonge v. Oregon, 299 U.S. 353 (1937)....................................31

Doe v. Cahill, 884 A.2d 451 (Del. 2005).....................................56

DTR Industries, Inc. v. NLRB, 297 Fed. Appx. 487 (6th Cir. 2008)..................61

iv

Edward J. DeBartolo Corp. v.Florida Gulf Coast Bldg.
    and Constr. Trades Council, 485 U.S. 568 (1988)..................31, 63, 64

Elsinore Shore Associates v. Local 54, Hotel Employees and
    Restaurant Employees Int'l Union, 820 F.2d 62 (3rd Cir. 1987)...............14

Fielder v. Greater Media, Inc., 2006 WL 2060404
    (Mich. App. July 25, 2006)..............................................................55

Frye v. District 1199, Health Care & Social Services Union,
    966 F.2d 141 (6th Cir. 1993)...........................................................36

Grand Trunk Western R.R. v. Brotherhood of Maintenance of
    Way Employees, 497 F.3d 568 (6th 2007).......................................58

Hamdan v. Rumsfeld, 548 U.S. 557 (2006).............................................37

Hetherington v. Great Lakes Orthopaedic Center, PC., 2009 WL 691873
    (Mich. App. March 17, 2009)..........................................................55

In the Matter of Crowe & Associates, Inc., 713 F.2d 211 (6th Cir. 1983).......*passim*

In re Johnson, 408 B.R. 115 (Bkr. S.D. Ohio 2009)...................................58

Int'l Ass'n of Machinists v. Eastern Air Lines, Inc., 121 B.R. 428 (S.D.N.Y. 1990)

    aff'd, 923 F.2d 26 (2d Cir. 1991).......................................57

Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,
    457 U.S. 702 (1982)................................................................*passim*

Knox County Local v. National Rural Letter Carrier's Ass'n,
    720 F.2d 936 (6th Cir. 1984)..........................................................27

Kavowras v. New York Times, 328 F.3d 50 (2nd Cir. 2003).........................7

Linn v. United Plant Guard Workers of America, Local 114,
    383 U.S. 53 (1966)...................................................................35

<u>Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v.
New York Shipping Ass'n</u>, 965 F.2d 1224 (2d Cir. 1992)....................43

<u>Louisiana v. Gremillion</u>, 366 U.S. 293 (1961)........................................30

<u>LRVCC Holdings LCC v. Brekka</u>, 581 F.3d 1127 (9th Cir. 2009)..............63, 64

<u>Machinists v. Street</u>, 367 U.S. 740 (1961)................................................9

<u>Machinists v. Wisconsin Employment Relations Commission</u>,
427 U.S. 282 (1976)......................................................*passim*

<u>Marcheck v. Eichenlaub</u>, 266 Fed. Appx. 392 (6th Cir. 2008)........................7

<u>Marine Cooks & Stewards v. Panama Steamship Company</u>,
362 U.S 365 (1960)........................................................39, 40

<u>Marine Transport Lines, Inc. v. Int'l Organization of Masters</u>,
770 F.2d 1526 (11th Cir. 1985)..........................................46

<u>Martin v. City of Struthers</u>, 319 U.S. 141 (1943)................................22, 23

<u>NAACP v. Alabama</u>, 357 U.S. 449 (1958).......................................28, 30

<u>NAACP v. Button</u>, 371 U.S. 415 (1963).................................................30

<u>NAACP v. Claiborne Hardware Co.</u>, 458 U.S. 866 (1982)..........................63

<u>NLRB v. Gissell Packing</u>, 395 U.S. 575 (1969)......................................26

<u>New Negro Alliance v. Sanitary Grocery Co.</u>, 303 U.S. 552 (1938)...............13

<u>New York Telephone Co. v. New York State Department of Labor</u>,
440 U.S. 519 (1979)........................................................61, 62

<u>New York Times Co. v Sullivan</u>, 376 U.S. 254 (1964)................................18

<u>Old Dominion Branch No. 496, Nat'l Letter Carriers v. Austin</u>,
418 U.S. 264 (1974)........................................................*passim*

vi

.

Order of Railroad Telegraphers and Milk Wagon Drivers Union v.
Lake Valley Co., 311 U.S. 91 (1940)................................... 39, 40, 44

Petrusch v. Teamsters Local 317, 667 F.2d 297 (2nd Cir. 1981).....................47

Pittsburgh & Lake Erie Railroad v. Railway Labor Executive's Ass'n,
491 U.S. 490 (1989)........................................................42, 44

Portland Pressman's Union v. Oregonian Pub. Co.,
188 F.Supp. 859 (D. Or. 1960), aff'd,
296 F.2d 4 (9th Cir. 1960).......................................................49

Role Models America, Inc. v. Jones, 305 F. Supp.2d 564 (D. Md. 2004)...........52

Russello v. United States, 464 U.S. 16 (1983).........................................37

San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959).......*passim*

Sandison v. Michigan High School Athletic Ass'n,
64 F.3d 1026 (6th Cir. 1995).....................................................50

Schneider v. State, 308 U.S. 147 (1939)................................................23

Scott v. Moore, 680 F.2d 979 (5th Cir. 1982) (en banc),
rev'd, 463 U.S. 825 (1983).......................................................45

Scottsdale Ins. Co. v. Flowers, 513 F.3d 546 (6th Cir. 2008)..........................10

Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,
436 U.S. 180 (1976)...............................................................36

Sigmon Fuel Co. v. Tennessee Valley Authority,
754 F.2d 162 (6th Cir. 1985)..................................................10, 17

Shamrock Foods Co. v. Gast, 535 F. Supp.2d 962 (D. Ariz. 2008).................51

Sherwood 48 Associates v. Sony Corp. of America,
76 Fed. Appx. 389 (2nd Cir. 2003)...............................................55

Snyder v. Ag Trucking Inc., 57 F.3d 484 (6th Cir. 1995)..............................18

Storer Communications, Inc. v. National Ass'n Broadcast Employees,
    854 F.2d 144 (6th Cir. 1988)....................................................31, 65

Taubman Co. v. Webfeats, 319 F.3d 770 (6th Cir. 2003).........................2, 10

Taxi-Cab Drivers Local 889 v. Yellow Cab Operating Co.,
    123 F.3d 262 (10th Cir. 1941).......................................................32

Tejidos De Coamo, Inc. v. Intl'l Garment Workers Union,
    22 F.3d 8 (1st Cir. 1994).........................................................44, 45

Telegraphers v. Chicago & N.W.R. Co., 362 U.S. 330 (1960).......................13

Thomas v. Collins, 323 U.S. 516 (1945)..........................................passim

Thornhill v. Alabama, 310 U.S. 88 (1940)....................................21, 64, 65

Triangle Constr. v. Our Virgin Islands Labor Union,
    425 F.3d 938 (11th Cir. 2005)....................................................14, 41

Trollinger v. Tyson Foods, 370 F.3d 602 (6th Cir. 2004)............................62

Utilities Services Engineering, Inc. v. Colorado Bldg. and Constr.,
    549 F.2d 173 (10th Cir. 1977)....................................................32, 39

United States v. Hutcheson, 312 U.S. 219 (1941)................................59, 66

United States v. Lanier, 520 U.S. 259 (1997)........................................63

United States v. McBoyle, 283 U.S. 25 (1931).......................................64

United States v. Santos, 128 S. Ct. 2020 (2008).....................................63

United Steelworkers v. Lorain, 616 F.2d 919 (6th Cir. 1980).......................48

Watchtower Bible and Tract Society of New York v. Village of Stratton,
    536 U.S. 150 (2002)..............................................................22, 24

viii

Wilson v. Birl, 105 F.2d 948 (3rd Cir. 1939)...............................................32

Western Union v. Int'l Brotherhood of Electrical Workers,
          133 F.2d 955 (7th Cir. 1943).......................................................32

## STATUTES

United States Constitution, First Amendment.................................*passim*

15 U.S.C. §§ 1-7 (Sherman Act)..........................................................47

15 U.S.C. §§ 12 et seq. (Clayton Act)...........................................*passim*

18 U.S.C. § 1030 (Computer Fraud and Abuse Act)..........................*passim*

28 U.S.C. § 1367.............................................................................54

29 U.S.C. §§ 101 et seq. (Norris-LaGuardia Act)..............................*passim*

29 U.S.C. §§ 141 et seq. (Taft-Hartley Act)....................................*passim*

29 U.S.C. § 157 et seq. (National Labor Relations Act)......................*passim*

## NATIONAL LABOR RELATIONS BOARD ACTIONS

Pulte Building Systems, No. 28-CA 28-22678
          (Region 28 October 30, 2009)..................................................7, 11

Pulte Building Systems, No. 28-CA 28-22719
          (Region 28 November 30, 2009)...............................................8, 11

## MISCELLANEOUS

72 Congressional Record 4771 (February 26, 1932)..............................38

72 Congressional Record 5507 (March 8, 1932)............................*passim*

Edward Purcell, *Brandeis and the Progressive Constitution* 87 (Yale 2000).......17

Frankfurter & Greene, *The Labor Injunction* 219 (1930).......................*passim*

## Statement of Issues Presented

Whether the District Court abused its discretion in denying the motion of Appellant Pulte Homes, Inc. for a preliminary injunction against speech and assembly about an ongoing labor dispute by Defendant Laborers International Union of North America ("LIUNA") and its leaders because of the jurisdictional prohibitions of the Norris-LaGuardia Act of 1932 against labor injunctions?

Whether Appellant Pulte Homes can establish that the District Court committed clear error in finding that the Defendants' efforts to publicize and to assemble protest over Pulte Homes, Inc. firing of its employees for wearing union t-shirts constitutes activity protected under the Norris-LaGuardia Act's prohibition of injunctions relating to publicizing or assembly regarding labor disputes?

Whether the District Court's order can be affirmed for Pulte's failure to satisfy the prerequisites for issuance of a preliminary injunction, or on grounds of labor preemption or statutory labor immunity?

## Standards of Review

A denial of a preliminary injunction is reversible only for an abuse of discretion, that is, when it is dependent upon clearly erroneous factual findings or legal error. Taubman Co. v. Webfeats, 319 F.3d 770, 774 (6th Cir. 2003). This Court can affirm on any grounds supported by the record, even if different from the grounds given by the District Court. Abercrombie & Fitch Stores, Inc. v. American

1

Eagle Outfitters, Inc., 280 F.3d 619, 629 (6th Cir. 2002).   As LIUNA explains in its concurrently filed motion to strike, Pulte's efforts to rely upon matters outside of the record, including the Amended Complaint it filed subsequent to the ruling under appeal, are inappropriate and not a proper basis for review of the District Court's order.

## Counterstatement of Facts

On September 2, 2009, seven Pulte employees arrived at their worksite in Tucson, Arizona wearing orange-colored LIUNA t-shirts.   Pulte fired all seven of the employees.   On Thursday, September 10, 2009, LIUNA filed an unfair labor practice charge against Pulte with the National Labor Relations Board ("NLRB"), claiming that these employees were terminated for engaging in protected organizational activity under the National Labor Relation Act ("NLRA"),  29 U.S.C. § 157.  See  RE No. 6, Exhibit  1 (alleging a violation of section 7 of the NLRA)[1].

On Friday, September 11th, the Regional Director of the NLRB gave notice to Pulte that he had determined, sua sponte that "injunctive relief pursuant to ....the [NLRA] may be warranted in this matter." See RE No. 6 ,Ex. 2.   On Sunday, September 13th, Pulte's Senior Vice President, Corporate Secretary and General Counsel  Steven Cook ("General Counsel") sent a letter to LIUNA's General

---

[1]   References to the record follow the same format used in Pulte's Opening Brief.

2

President, defendant Terence O'Sullivan. RE No. 2 Ex. A to Exhibit 1 (Cook

Declaration) ("GC Letter").    The letter from Pulte's General Counsel complains

about LIUNA making "false and defamatory allegations" that Pulte terminated its

employees in Arizona. Id.

Specifically, Pulte's General Counsel denied that Pulte had terminated the

Tucson employees, and claimed that LIUNA was falsely accusing Pulte of having

done so. He further complained that:

> All the communications that we have received repeat the false allegations
> originally made by LIUNA that Pulte unlawfully terminated employees for
> engaging in union activity. In fact, your so called 'action alerts' clearly are
> the source of these false allegations. Those alerts not only make these false
> and defamatory allegations, they also encourage your members to further
> disseminate this information. Specifically, LIUNA has drafted
> communications which state in part: ....
>
> 'I will do everything within my power to make sure my co-workers,
> my friends and   my family known what Pulte did to these workers.'
> Not only are the allegations false, but LIUNA is aware, and has
> been aware of the falsity of its allegations.

GC Letter.

The General Counsel's September 13th letter goes on to state that "e-mails

are filling mailboxes and distracting Pulte employees from their work," and that

"[m]anaging the emails takes great effort and cost." GC Letter. The General

Counsel's letter, however, does not mention or allege anything about any damage

to Pulte's computer or computer systems.[2]  Instead, the letter ends with a demand

that "you cease encouraging this activity and use every means available to you to

put an end to this activity." Id.    In substance, the General Counsel's letter

demanded that LIUNA stop publicizing its labor dispute with Pulte, and start

suppressing the related speech of its members and the supporters of the terminated

Pulte employees.

On Tuesday morning, September 15th, Pulte filed a complaint in the United

States District Court for the Eastern District of Michigan against LIUNA, its

General President O'Sullivan, and its National Organizing Director, Randy

Mayhew, alleging a violation of the Computer Fraud and Abuse Act, 18 U.S.C. §

1080 ("CFAA"), and supplemental state law claims for tortious interference with

business, trespass to chattel, and conspiracy. RE No. 1.  Pulte simultaneously filed

an ex parte application for a temporary restraining order or preliminary injunction

seeking, among other things, a court order directing Defendants immediately to

"cease and desist" their email and telephone campaigns, to "take down the website

entry entitled  "Tell Pulte Homes LIUNA's Colors Don't Run,'" to "instruct their

members to cease the e-mail and telephone campaign . . . including but not limited

to falsely stating that Pulte terminated seven Tucson crew employees;" and "to

_____

[2] CF. Opening Brief, at 24 (alleging, without citation, that Pulte "explained it was
damaged.")

4

provide a list of all customers and non-Pulte individuals contacted via e-mail, telephone, or otherwise." RE No. 2, at 2.

In its Complaint, Pulte alleged that defendants had engaged in a "campaign" involving flyers, phone calls, and emails to make allegedly false allegations regarding the Arizona terminations. Complaint, ¶¶ 21-28 (describing a flyer entitled "Rehire the Tucson 7"). All communications, in one way or another, advocated for the jobs of the former Pulte employees.

The Complaint further alleged that LIUNA had encouraged persons to email three senior Pulte managers—Pulte's Chief Executive Officer, its National Customer Relations Manager, and the President of its Arizona Division—regarding the termination of the Arizona employees. Complaint, ¶¶ 21, 25.

The District Court denied the TRO the following day but scheduled a preliminary injunction hearing for September 22, 2009. In a submission filed the day before the hearing, Pulte produced examples of the emails it had received, all of which related to the ongoing labor dispute, uniformly sought the re-hiring of the terminated Pulte employees, and contained nothing remotely offensive. RE No. 13, Exs 2 & 3.

During the evidentiary hearing, Pulte's counsel admitted that the emails which were sent to its executives were authorized. RE No. 22, Transcript, at 9. ("We are not saying that they weren't authorized to send emails."). Pulte claimed

5

that Defendants violated the CFAA because they "exceeded their authorized access," by disrupting the business of "these three executives," "making it very difficult for them to do their business using their computers which is a vital tool in the workforce of today." Id. at 9, 11. The District Court asked how sending emails constituted obtaining "access" to Pulte's computers for purposes of establishing the claim of unauthorized "access" under the CFAA, but Pulte's counsel responded that this was not Pulte's "primary claim." Id., at 7. When the District Court probed about the alternative "transmission" prong of Pulte's computer claim, Pulte's counsel answered that the emails have "made our e-mail system nonproductive and unusable to some extent." Id. at 8-9.

Pulte also complained about its employees receiving telephone calls or messages, but has acknowledged that the "subject of these calls" to its employees was the "alleged termination." Opening Brief, at 15. Pulte contended that the content of some of these anonymous telephone communications or voice messages was profane or intimidating. At the hearing, the District Court bore down on this point, asking Pulte's counsel: "You are saying that these calls, these threatening phone calls and these obscene calls, you can trace to the defendants?" (RE No. 22, Transcript, at 15). Plaintiff's counsel's response was: "We can trace to something they have authorized and ratified because they put on their website this call to action, okay?" Id.

6

The Court denied the preliminary injunction application in a written order on September 24, 2009. The Court found that the activity at issue was part of a labor dispute within the scope of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. (the "Act" or "NLGA"), and that it fell within that Act's protection against injunctions for publicizing the existence or facts regarding a labor dispute, or for peaceful assembly. See 29 U.S.C. § 104. On September 29, 2009, Pulte appealed.

On October 30, 2009, the General Counsel of the NLRB issued a complaint on behalf of the Board against Pulte. Pulte Building Systems LLC, No. 28-CA-22678 (Region 28 October 30, 2009).[3] In its complaint, the Board's General Counsel alleged that Pulte terminated six of the Tucson employees who were the subject of LIUNA's unfair labor practice charge in violation of the NLRA and in retaliation for organizing activity. The Board's General Counsel subsequently filed another unfair labor practice charge against Pulte arising out of its response to LIUNA's organizing activity. Pulte Building Systems LLC, No. 28-CA-22719 (Region 28 November 30, 2009).

## Summary of Argument

The District Court did not abuse its discretion by denying Pulte's motion to enjoin speech regarding a labor dispute because of the prohibitions on labor

[3] This Court may take judicial notice of charges filed before the NLRB. Kavowras v. New York Times, 328 F.3d 50, 57 (2d Cir. 2003). See also Marcheck v. Eichenlaub, 266 Fed. Appx. 392 (6th Cir. 2008)(unpublished opinion)(taking judicial notice of information on government website during appeal).

7

injunctions in the Norris-LaGuardia Act. The District Court's factual findings that the activity at issue involved a labor dispute, involved publicizing a labor dispute, and involved associated peaceful assembly--all of which are protected from injunction under the Act--are not clearly erroneous. Pulte's claim—made for the first time on appeal—that the activity at issue is excluded from the Act's protection because it allegedly involved violence and fraud, is unpreserved and unsubstantiated. Pulte has not acknowledged, much less satisfied, the clear and convincing standard of proof required under the Act for such a finding against these Defendants. Pulte's argument on appeal that any unlawful act is exempt from the Act's protection is contrary to the plain language of the Act, its substantial legislative history, and its consistent construction thereafter by the Supreme Court and this Court.

Alternatively, this Court can affirm on the ground that Pulte has failed to meet either the general requirements for a preliminary injunction or the Act's additional statutory requirements, including the requirement that Pulte should have exhausted all reasonable efforts to resolve this dispute prior to seeking an injunction. 29 U.S.C. § 108. In addition, this Court can affirm on the grounds that the suit is preempted under the federal labor laws, or the activity is statutorily immune from prosecution.

## ARGUMENT

I.   **The District Court Did Not Abuse Its Discretion in Concluding That the Norris-LaGuardia Act Compelled Denial of Plaintiff's Request for Injunctive Relief**

"'The Norris LaGuardia Act . . . expresses a basic policy against the injunction of activities of labor unions.'" Burlington Northern Railroad v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429, 437 (1987) (quoting Machinists v. Street, 367 U.S. 740, 772 (1961)). That policy takes the form of depriving federal courts of jurisdiction to enjoin activity in a "case growing out of or involving a labor dispute," as described by section 1 of the Act, and specifically bars injunctions for conduct enumerated under section 4 of the Act. Burlington Northern Railroad, 481 U.S. at 437. Here, the activity which Pulte asked the District Court to enjoin lies at the core of union activity which is shielded from injunctive interference by the Act—speech and assembly about an ongoing labor dispute. The District Court did not abuse its discretion in denying Pulte's demand that the Court enjoin such protected labor speech and assembly.

### A. The Norris-LaGuardia Act Applies to the Conduct at Issue

The District Court found, and Appellant Pulte has not challenged in either the District Court or this Court, that the activity at issue—speech directed to Pulte's alleged unfair labor practices against its employees during an organizing campaign by defendant LIUNA—renders this a "case involving or growing out of

9

a labor dispute," within the meaning and scope of the Act., 29 U.S.C. § 113(c).

Opinion, at 4-5. If this Court decides to address this issue despite Pulte's failure

to preserve it below or to assert it here,[4] this factual finding by the District Court

would be subject to review only for clear error. Taubman Co. v. Webfeats, 319

F.3d 770, 774 (6th Cir. 2003). Here, the record amply supports the District Court's

finding.

### 1. The District Court Did Not Clearly Err in Finding That the Activity at Issue Involves or Grows Out of a Labor Dispute

Initially, the activity at issue is focused upon Pulte's termination of its

employees in Tucson, Arizona for engaging in union organizing activity—that is,

for wearing of LIUNA t-shirts at the worksite. RE No. 6, Ex. 1. Only days after

their termination, LIUNA filed an unfair labor practice before the NLRB on

September 10, 2009. Id. Similarly, Pulte has admitted to this Court that it was

"the alleged termination that was the subject of the calls." Opening Brief, at 15.

---

[4] See, e.g., Sigmon Fuel Co. v. Tennessee Valley Authority, 754 F.2d 162, 164 (6th Cir. 1985) (refusing to address argument not raised before district court in the first instance); Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 551-53 (6th Cir. 2008) (issues not raised in district court generally waived); American Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 477 (6th Cir. 2004) (this Court has consistently refused to consider issues raised for first time in a reply brief). These judicial policies are reinforced by the Norris-LaGuardia Act's procedural provisions which require evidentiary hearings, cross-examination rights, clear and convincing evidence requirements, necessary judicial factual findings, and limit relief to matters which are expressly pled. See, e.g., 29 U.S.C. §§ 106, 107, 109.

LIUNA's website publicized this dispute, and rallied support for the victim employees, by announcing "These Colors Don't Run."    Since LIUNA filed its unfair labor practice charges, the General Counsel of the NLRB has issued two separate complaints charging Pulte with committing unfair labor practices by, among other things, terminating its employees. See, e.g., Pulte Building Systems, Nos. 28-CA 28-22678, 22719.    In addition, the District Court observed that Pulte, in its Complaint, alleged that "Defendants had attempted for the past two years to force Plaintiff's subcontractors to enter into agreements with LIUNA." Op. at 2. Cf. Complaint, ¶ 15.

There is nothing  clearly erroneous in the District Court's ruling that: "there is a labor dispute because the actions of Defendants to which Plaintiff objects are directly related to (1) Plaintiff's alleged termination of employees for supporting LIUNA, and (2) Defendants' ongoing efforts to force Plaintiff's subcontractors to enter into agreements with LIUNA." Op. at 5.

Second, the affidavits furnished by Pulte from its own employees confirm that the email and other communications they received relate to the termination of the Tucson employees. See, e.g., GC Letter ("All of the communications we have received repeat the false allegations originally made by LIUNA that Pulte unlawfully terminated employees for engaging in union activity."); RE No. 2,  Ex. 4 (Declaration of Pulte National Customer Relations Manager that he received

11

emails that "contained demands referencing a dispute regarding certain employees in Arizona," and "demanded that Pulte return 7 individuals to work."); id. Ex. 5 (declaration of Pulte receptionist that she received calls that "made reference to a dispute involving certain Pulte employees").

Third, the District Court cited and applied the Norris-LaGuardia Act's statutory definition of a "labor dispute" covered by the Act. Op. at 5 (citing and quoting 29 U.S.C. § 113(c)) defining a labor dispute as "'any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.'"). The Supreme Court has "long recognized that 'Congress made the definition [of 'labor dispute'] broad because it wanted it to be broad. . . . Congress attempted to write its bill in unmistakable language because it believed previous measures looking toward the same policy against nonjudicial intervention in labor disputes had been given unduly limited constructions by the Courts.'" Burlington Northern Railroad Co., 481 U.S. at 441 (1987) (quoting Telegraphers v. Chicago & N.W.R. Co., 362 U.S. 330, 335-36 (1960)).

The judicial standard gleaned from the Act's statutory definition is equally broad, as the Supreme Court has merely required that an "employer-employee

relationship be the matrix of the controversy." <u>Jacksonville Bulk Terminals, Inc.</u>

<u>v. Int'l Longshoremen's Ass'n</u>, 457 U.S. 702, 712 (1982). <u>See, e.g.</u>, <u>New Negro</u>

<u>Alliance v. Sanitary Grocery Co.</u>, 303 U.S. 552 (1938) (civic group picketing a

grocery store to change its racial hiring practices constitutes a labor dispute).

Accordingly, the labor dispute activity at issue is clearly subject to the

provisions of the Norris-LaGuardia Act.

### 2. The Act's Anti-Injunction Provisions Apply to This Labor Dispute

Section 1 of the Norris-LaGuardia Act broadly declares:

No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case or controversy growing out of a labor dispute, except in strict conformity with this statute; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 U.S.C. § 101 (emphasis added). This section makes the Act "the exclusive

source of federal court jurisdiction to issue injunctive relief in cases involving or

growing out of labor disputes." <u>Elsinore Shore Associates v. Local 54, Hotel</u>

<u>Employees and Restaurant Employees Int'l Union</u>, 820 F.2d 62, 67 (3rd Cir. 1987).

Section 2 of the Act broadly defines the public policy to be served by the

Act: the "individual unorganized worker is commonly helpless to exercise actual

liberty of contract and to protect his freedom of labor. . . wherefore, . . . it is

necessary that he have full freedom of association, self-organization and

13

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 25

designation of representatives . . . and that he shall be free from the interference,

restraint, or coercion of employers of labor . . . in self-organization or in other

concerted activities for the purpose of . . . mutual aid or protection. . . ." 29 U.S.C.

§ 102.

In turn, section 4 of the Act, bars the issuance of injunctions to prohibit

persons from certain conduct and "explicitly lists situations in which the court does

not have jurisdiction." Triangle  Construction & Maintenance Corp., 425 F.3d

938, 946 (11th Cir. 2005).  This list of  activities that are subject to the Act's

express protection—sometimes described as immunities from injunctive relief,[5]--

include barring court jurisdiction over the following conduct:

> (d) By all lawful means aiding any person participating or  interested in
> any labor dispute who is being proceeded against in, or prosecuting, any
> action or suit in any Court of the United States or of any State;
> (e) Giving publicity to the existence of, or the facts involved in, any labor
> dispute, whether by advertising, speaking, patrolling, or by any other
> method not involving fraud  or violence;
> (f) Assembling peaceably to act or to organize to act in promotion of
> their interests in a labor dispute;
> (g) Advising or notifying any person of an intention to do any of the acts
> hereto specified;
> (h) Agreeing with other persons to do or not to do any of the acts hereto
> specified; and
> (i) Advising, urging, or otherwise causing or inducing without fraud or
> violence the acts heretofore specified . . . .

29 U.S.C. § 104.

---

[5]  See, e.g., Burlington Northern, 481 U.S. at 439; Frankfurter and Greene, Labor
Injunctions 215 (1930) (describing section 104 as providing immunity).

The list of activities enumerated in section 104 is illustrative but not exhaustive of the activity relating to labor disputes that section 1 of the Act shields from injunctive decrees. Triangle Construction & Maintenance Corp., 425 F.3d 938, 946 (11th Cir. 2005) (citing AT&T Broadband, LLC v. Int'l Bhd. Of Elec. Workers, 317 F.3d 758, 760-61 (7th Cir. 2003) (Easterbrook, J.). As Judge Easterbrook noted in the AT&T Broadband case:

> The whole Norris-LaGuardia Act [of 1932] is a response to judicial evasion of section 20 of the Clayton Act [of 1914], 29 U.S.C. § 52. Section 4 of the Norris-LaGuardia Act ensured that the new statute would not suffer the same fate. It would be ironic if the enactment of § 4 to make sure that judges keep their noses out of labor disputes were used to evade the broader scope of § 1.

AT&T, 317 F.3d at 760-61.[6]

The anti-injunction provisions of the Act "are to be given a 'broad interpretation.'" Allied Systems Inc. v. Teamsters Nat. Auto Transporters Industry, 179 F.3d 982, 987 (6th Cir. 1999) (quoting Jacksonville Bulk Terminals, Inc.).

---

[6] Congressman LaGuardia, in the floor debates, while decrying the involvement of a "few" federal judges in ignoring the anti-injunction provisions of the Clayton Act "simply to aid the employer's side in a labor dispute," commented that "every one" of the members with whom he had spoken who t were former judges and attorneys in such disputes supported the legislation. 72 Cong Rec. 5478, 5506 (March 8, 1932). Similarly, Professor Frankfurter, in his 1930 book entitled The Labor Injunction, claimed there was "considerable evidence" of "the weakened prestige of the judiciary, due to the exercise of its equitable powers in labor controversies." Frankfurter & Greene, The Labor Injunction 131 (1930).

Finally, for those rare circumstances in which an injunction would not violate either section 104, or the public policy of sections 101 and 102, Congress provided for additional procedural and substantive safeguards in sections 107 through 109 further to restrict the authority of courts to issue injunctions related to labor disputes[7]

### 3.    The District Court Did Not Clearly Err in Finding that the Activity Falls Within the Act's Immunity Provisions for Publicizing a Labor Dispute and for Peaceful Assembly

The District Court found that the conduct at issue in this case not only involved a "labor dispute" within the meaning of the Act, but also fell within the "publicity" subsection (e) and the "promotion" subsection (f) of section 104. Op. at 5-6. While Pulte did not challenge the applicability of these subsections below, it does so now on appeal, and claims that the District Court's findings are clearly erroneous. They are not.

By failing to challenge the applicability of subsections (e) and (f) before the District Court, Pulte has waived its ability to do so here. Sigmon Fuel Co., 754

---

[7] In his book describing this draft legislative language, then-Professor Frankfurter explained the language of subsections 4(e) to (i) as "describ[ing] conduct that is unrestrainable and they do so without use of the treacherous adjective 'lawful.'" Frankfurter & Greene, The Labor Injunction 219 (1930).    Professor Frankfurter was one of the law professors whom Judiciary Chairman Norris tasked with drafting the legislation in 1928. Edward Purcell, Brandeis and the Progressive Constitution 87 (Yale 2000).

F.2d at 164.  Even if this issue had been preserved, however, the District Court's findings are not clearly erroneous.

### a. Pulte Has Not  Demonstrated that the District Court's Application of  the Publicity Subsection Is Clearly Erroneous

Subsection 104(e) protects "giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any method not involving fraud or violence."  Id. (emphasis added).   In addition, subsection 104(g) further protects "Advising or notifying any person of an intention to do any of the acts hereto specified."  Thus, the Act expressly protects not only publicizing a labor dispute, but also giving notice to "any person" of  an intent to publicize a labor dispute.

Pulte argues that the activity does not fit within the publicity subsection because it does not constitute advertising or patrolling.  Pulte further claims that below it only challenged the targeted emailing of three of its senior executives, which it argues in this Court as being outside the scope of the publicity protected by the Act.  Opening Brief, at 35.   Pulte mischaracterizes its claims below, and its position on appeal lacks merit.

Initially, the General Counsel's letter evidences Pulte's concern about the publicity being generated by Defendants.    In his letter to Defendant O'Sullivan, Pulte's General Counsel complained  about LIUNA's making "false and

defamatory allegations" that Pulte terminated its employees. GC Letter. Publication is typically a necessary element for a defamation claim.[8] Pulte's General Counsel accused LIUNA of being the source of these false and defamatory allegations, and complained that LIUNA "also encourage[s] your members to further disseminate this information." Id. The General Counsel's letter complained that "LIUNA has drafted the communications which state in part: . . . 'I will do everything in my power to make sure my co-workers, my friends, and my family know what Pulte Homes did to these workers . . .'" Id. Indeed, the Pulte General Counsel's letter ended with the demand that "you cease encouraging this activity and use every means available to put an end to this activity," or a suit would follow. Id. The General Counsel's letter reveals that publicity was on Pulte's mind.

Nor does it help Pulte to mischaracterize both its complaint and the relief it is seeking.[9] While telling this Court that Pulte does not seek to "prevent

---

[8]   See e.g., Snyder v. Ag Trucking Inc., 57 F.3d 484, 489 (6th Cir. 1995) (publication necessary for prima facie case of defamation). The Supreme Court has held that, because of the constitutionally protected nature of labor speech, a common law defamation claim must satisfy the Sullivan standard of maliciousness for a public figure. Old Dominion Branch No. 496, Nat'l Letter Carriers v. Austin, 418 U.S. 264, 275 (1974). Although Pulte's complaint repeatedly alleges that Defendants falsely accused Pulte of terminating employees for organizing activity, it does not contain a defamation claim nor an allegation of malice.

[9]   Pulte concedes that its allegations regarding potential "spoofing" involved the public. Opening Brief, at 35 n.6. The Complaint's sparse "spoofing" allegations, are made on information and belief, but the only "information" offered to support

18

[Defendants from] publicizing the dispute on their website," Opening Brief at 35.,

Pulte's Complaint in the District Court actually seeks a judicial decree "Ordering

Defendants to take down the website entry entitled 'Tell Pulte Homes Liuna Colors

Do Not Run' which instructs members to send e-mails to Pulte and facilitates the

sending of such e-mails." Complaint, page 13.

     Similarly, the Complaint is replete with allegations that Defendants' alleged

"corporate campaign" against Pulte is directed to the general public. Complaint, ¶¶

2 (alleging interference by Defendants with Pulte's "relationships with the general

public"); 19 (alleging targeted effort by Defendants to "negatively affect" Pulte's

"relationships with the . . . general public, customers, and potential customers");

38 (activities are a "piece of a larger national corporate campaign aimed against

Pulte"). Given this showing by Pulte below, it would be hard to characterize the

District Court's finding that this case involves the publicization of a labor dispute

as clearly erroneous, especially because all the Court needed to do to reach this

finding was to credit Pulte's own allegations.

---

them is that that an unidentified person left a message with Pulte demanding that
Pulte stop leaving messages on his voice mail. Complaint, ¶ 35. Given the recent
nationwide housing debacle, it is possible for Pulte to experience difficult lines of
communication with one or more of its actual or potential customers without
attributing one caller's dissatisfaction to a hypothetical "spoofing" operation. No
evidence of spoofing was offered below, and Pulte's Brief purports to rely upon
allegations in an amended complaint not before the District Court at the time of its
ruling. Id. at 18-19.

Subsection 104(e) expressly protects "speaking . . . or any other method" of giving publicity to the existence or facts of a labor dispute, absent fraud or violence. This certainly includes LIUNA's solicitation of supportive emails from members of LIUNA or from the general public to be communicated to the Pulte senior corporate officials who have ultimate responsibility for Pulte's corporate conduct. It is the dissemination of the voices of the general public to Pulte's senior executives that is the "method" of publicity at issue here.

The dissemination of such information is protected not only by subsection (e) of the Act, but also by the Constitution. Thornhill v. Alabama, 310 U.S. 88, 102 (1940) (The "dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution."). By transmitting their individual emails, the senders are publicizing the existence or facts of an ongoing labor dispute, and their individual concerns about it, to the very people in a position to address it. [10]

Pulte claims that this is not a matter involving speech or publicity, but rather only addresses property issues, and further appears to be claiming that it is a "private actor" and therefore not subject to the labor laws. Opening Brief, at 37 (citing Compuserve Inc. v. Cyber Promotions, Inc., 962 F. Supp. 1015 (S.D. Ohio

---

[10]    Pulte ironically simultaneously faults LIUNA for the fact that telephone calls were made to Pulte's sales employees who "were not involved in the alleged termination that was the subject of the calls, nor did they have authority or responsibility regarding the termination." Opening Brief, at 15.

1997) (enjoining the unauthorized use of a private internet network for the dissemination of commercial spam in violation of defendant's subscription agreement.).   But federal labor laws unquestionably apply to private employers. Chamber of Commerce v. Brown, 128 S. Ct. 2408 (2008).

In addition, the distribution of literature, especially by canvassing, has long been held to be within the core values and protections of the First Amendment, even when it involves private property.  See, e.g., Watchtower Bible and Tract Society of New York v. Village of Stratton, 536 U.S. 150 (2002); Martin v. City of Struthers, 319 U.S. 141 (1943).   In the Watchtower Bible case, the Supreme Court analyzed the "themes" which have emerged from fifty years of precedent sustaining the rights of Jehovah's Witnesses to canvass and leave literature at private homes against various forms of censorship and regulation, including requirements to pre-register their intent to canvass. 536 U.S. at 161.

"First, the cases emphasize the value of the speech involved." 536 U.S. at 161. Here, the labor speech at issue is affirmatively protected by statute,[11] and by the Constitution. Chamber of Commerce, 128 S. Ct. at 1413-14.   Second, the cases address the "historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas."  Id. ("'pamphlets have proved the most effective instruments in the dissemination of opinion;'" "'And perhaps the most eff

---

[11]  See, e.g., 29 U.S.C. § 104(e); 29 U.S.C. § 157; 29 U.S.C. § 158(c).  Accord, Chamber of Commerce, 128 S. Ct. at 2413-14.

effective way of bringing them to the notice of individuals is their distribution at the homes of the people;'" "'To require a censorship through license which makes impossible the free and unhampered distribution of pamphlets strikes at the very heart of the constitutional guarantees.'" (quoting <u>Schneider v. State</u>, 308 U.S. 147, 164 (1939) (emphasis added by Court).

The right to speak is not limited to saving souls, but also applies, as here, to saving jobs. Publicizing labor disputes by canvassing and pamphleteering has been an important means for the dissemination of information relating to the needs of the everyday laborer. The Court noted that "the cases demonstrate that efforts of the Jehovah's Witnesses to resist speech regulation have not been a struggle for their rights alone," but rather that "'[d]oor to door distributions of circulars is essential to the poorly financed campaigns of little people.'" <u>Id</u>. at 163 (quoting <u>Martin</u>, 319 U.S. at 144-46). Indeed, the Supreme Court analogized the circumstances of the Jehovah's Witnesses to that of the labor leader in <u>Thomas v. Collins</u>, 323 U.S. 516 (1945) who was required to register his intent to speak on labor issues. Quoting the <u>Thomas</u> opinion, the Court reaffirmed:

> If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and from imposing a penalty for violating such a restraining order. So long as no more is involved than exercise of the rights of free speech and free assembly, it is immune from such a restriction. If one who solicits support for the cause of labor may be required to register as a condition to the

22

exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment.

536 U.S. at 164 (quoting <u>Thomas</u>, 323 U.S. at 539-40).

While recognizing the legitimacy of municipal interests in preventing crime and fraud, and protecting privacy, the <u>Watchtower Bible</u> case examined the fit between these asserted interests and the breadth of the ordinance's impact on all speech. The Court noted that the pre-registration ordinance inhibits the anonymous support of causes, inhibits speech by burdening it or by making it subject to license, and banned spontaneous speech. 536 US. at 541. Central to the Court's invalidation of the ordinance was the far broader impact on speech than justified by the government interests it allegedly promoted.

As to the privacy interests of residents, the Court held that the posting of "No Solicitation" signs was a less intrusive means to satisfy this interest. <u>Id</u>. at 168-69 ("The annoyance caused by an uninvited knock at the front door is the same whether or not the visitor is armed with a permit."). Here, Pulte's counsel conceded, at the evidentiary hearing that Pulte was "not saying that they weren't authorized to send emails." RE No. 22, Transcript, at 9. Accordingly, Pulte did not post the equivalent of a "No Solicitation" sign.

23

Case: 09-2245   Document: 33-1   Filed: 01/19/2010   Page: 34

Indeed, all that Pulte has to do is screen or filter the emails it chooses to receive over the Internet, a practice quite common for senior executives in large nationwide public companies. See Complaint, ¶ 14 (alleging that Pulte is the "largest new homebuilder in the United States"). The District Court pressed this very point at the hearing below, asking Pulte's counsel why "you don't reprogram your computer so that they don't accept emails from these people?" RE No. 22, Transcript, at 5. Pulte's counsel responded: "We have attempted to do that, your Honor, but the fix is only a temporary fix and we are quite certain that they can get around that . . ." Id. In other words, Pulte has the technical capability of blocking unwanted emails, but instead launched this lawsuit ostensibly out of doubts about its future technical competence.

Subsections 104 (g) and (h) of the Act anticipate and reject the very argument that Pulte now seeks to raise. In subsection (g), Congress shielded from injunction the acts of "Advising or notifying any person of an intention to do any of the acts hereto." 29 U.S.C. § 104(g). Congress expressly provided that participants in labor disputes can give notice to others, including to the Pulte executives here, of "the existence of, or the facts involved in, any labor dispute." § 104(e). Likewise, subsection (h) shields from injunction "Agreeing with other persons to do or not to do any of the acts hereto specified." 29 U.S.C. § 104(h). Congress thereby protected any agreement by participants in labor disputes to

24

publicize to, or to notify, Pulte executives about the "existence of, or the facts involved in, any labor dispute." § 104(e).

The Act's protection of labor speech is not only the product of historical experience,[12] it represents a considered decision by Congress to favor continued speech among labor dispute participants over the suppression of speech by injunction.   Those same values, rooted in the First Amendment guarantees of free speech and assembly, were reinforced by Congress in 1947 when it enacted  8(c) of the National Labor Relations Act which "expressly precludes regulation of speech

_____

[12]  On the House floor, Congressman Pettengill described the circumstances under which the Act was being considered:

> One of the marvels of this depression has been the fortitude, the courage, the patience, and the patriotism of the workers of the Nation who in the face of privation and suffering and long despair have done their full part, and more than their part, in meeting a situation which they did not make.
>
> Men and women in the face of conditions such as we are passing through, who day in and day out have stood in bitter weather at the closed doors of factories waiting for jobs and in the bread lines waiting for food and yet have exhibited such self-control that practically no violence has been done to property in these times that try men's souls, can be trusted by the lawmakers of this Nation.  With few exceptions the hearts of these men are sound.  I would rather place my trust in the justice in their hearts than in some of the judges in the courts.

72 Congressional Record 5498 (March 8, 1932).  The Act passed the House by a vote of 362 to 14.  Id. at 5511.

25

about unionization 'so long as the communications do not contain a threat of reprisal or force or promise of benefit.'" Chamber of Commerce, 128 S. Ct. at 2414 (quoting NLRB v. Gissell Packing, 395 U.S. 575, 618 (1969)). See 29 U.S.C. § 158(c) ("The expressing of views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any provisions of this subchapter, if such expression contains no threat or reprisal or force or promise of benefit.").

In the Chamber of Commerce opinion, the Supreme Court reaffirmed that this express statutory protection of free speech both implements the First Amendment and broadly protects noncoercive labor speech against any regulation by states or the federal government.   128 S. Ct. at 2413-14.  Accordingly, in 1932 with section 4 of the NLGA, in 1935 with section 7 of the NLRA,[13] and in 1947 with the new section 8(c) of NLRA, Congress immunized noncoercive labor speech from government regulation as a means of furthering the underlying First Amendment guarantees.[14]

---

[13]   Letter Carriers, 418 U.S. at 277 (the "primary source of protection for union freedom of speech under the NLRA, however, particularly in the organizational context, is the guarantee in § 7 of the Act of the employee's rights 'to form, join, or assist labor organizations.'").

[14]   In 1959, Congress also enacted legislation requiring labor unions to safeguard the free speech and assembly rights of its members. 29 U.S.C. § 411(a)(2).  See

b.    **Pulte Has Not Demonstrated that the District Court's Application of the Assembly Subsection Is Clearly Erroneous**

Although a finding that the publicity subsection barred jurisdiction would suffice by itself, the District Court also found that subsection 104(e)—which protects "[a]ssembling peaceably to act or to organize to act in promotion of their interests in a labor dispute"—also applies to the speech activities at issue here. Op. at 5-6.    Pulte disputes this—again for the first time on appeal-and now challenges the applicability of subsection 104(e) to this labor dispute.   But in the General Counsel Letter, Pulte contended that "all" of the communications it has received "repeat the false allegation originally made by LiUNA that Pulte unlawfully terminated employees for engaging in union activity," and complained that LiUNA's communications "encourage your members to further disseminate the information." GC Letter.    Equally important, Pulte's complaint alleges that LIUNA's website repeats this information and urges visitors to "Tell Pulte: LIUNA's Colors Don't Run," and seeks an order to Defendants to "take down the website entry." Complaint, ¶ 21, prayer. Pulte was apparently concerned that LIUNA was mobilizing its members.

---

generally Knox County Local v. National Rural Letter Carrier's Ass'n, 720 F.2d 936, 939 (6th Cir. 1984).

The Supreme Court has acknowledged: "Effective advocacy of both private and public points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." <u>NAACP v. Alabama</u>, 357 U.S. 449, 460 (1958).   According to the Supreme Court, "the practice of people sharing common views banding together to achieve a common end is deeply embedded in the American political process," and that '[i]ts value is that by collective effort individuals can make their views known, when, individually, their voices would be faint, or lost." <u>Citizens Against Rent Control Coalition for Fair Housing v. Berkeley</u>, 354 U.S. 290, 294-95 (1981).

Pulte's grievance is that LIUNA's website invites visitors, provides them with allegedly false information about an ongoing labor dispute between LIUNA and Pulte, and urges them to speak out on this labor dispute.  If a labor union cannot use its own website to attract, inform, and inspire its membership about an ongoing labor dispute within the ambit of the NLGA, the right of assembly protected therein would be illusory.   The right of union members, or even the interested public, to associate on LIUNA's website, for purposes of addressing an ongoing labor dispute is statutorily secured by not only the NLGA but also by

28

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 40

Order of Railroad Telegraphers, 362 U.S. at 339 n.15). In the Crowe case, this

Court held that, where a union's actions did not involve violence, the Act barred

issuance of any injunction merely because its conduct violated the Bankruptcy Act,

or was contrary to the automatic stay injunctive provisions of that Act. Id. at 214.

In Crowe, this Court stated that "we cannot believe that the Norris-

LaGuardia Act was to be superseded sub silentio" by passage of the Bankruptcy

Act. Id. at 215. This reasoning is even more apt here, where the speech activity at

issue has been thrice protected by Congress—first, with the enactment of the

Norris LaGuardia Act in 1932; second, with the 1935 enactment of the NLRA's

employee rights provisions (section 7); and third, with the 1947 enactment of

NLRA's free speech provisions (section 8(c))—all of which implement the First

Amendment. Chamber of Commerce, 128 S. Ct. at 2413-14. It is even less likely

that Congress intended to supersede—sub silentio—the longstanding and mutually

reinforcing statutory and constitutional protections applicable to such speech by

passage of the CFAA. Accordingly, Pulte's position is foreclosed by this

unbroken chain of precedent.

The Supreme Court has narrowly recognized three limited exceptions to the

Norris-LaGuardia Act, but all of these judicial exceptions have involved

reconciling the competing commands of another federal labor statute and policy,

and none are applicable here. Triangle Constr. v. Our Virgin Islands Labor Union,

425 F.3d 938, 944-45 (11th Cir. 2005) (describing three exceptions recognized by Supreme Court for labor statutes). The Supreme Court has never held that the Act's protections must yield to nonlabor laws, and such a result would return to the practice of judicial intervention that motivated Congress to enact a jurisdiction-stripping Act in the first place.

Pulte seeks to distinguish the Crowe case by arguing that it was superseded by the subsequent case of Pittsburgh & Lake Erie Railroad v. Railway Labor Executive's Ass'n, 491 U.S. 490 (1989). Opening Brief, at 22 n.4.  The Pittsburgh Railroad case, however, addressed the narrow but inapposite issue of how to reconcile related labor statutes, the Norris-LaGuardia Act with the prior Railway Labor Act, in a case involving railroad workers.  In the Pittsburgh Railroad case, the Court simply followed its earlier precedents which had held that these two labor statutes had to be reconciled. 491 U.S. at 513.  Indeed, in the Chicago River Railroad case (cited with approval in the Pittsburgh Railroad opinion), the Supreme Court addressed this very issue.  Specifically, the Chicago River Railroad opinion concluded that prior cases holding that the Norris-LaGuardia Act's "ban on injunctions is not lifted because the conduct of the union is unlawful under some other statute" was inapplicable  precisely because these other cases did not "involve[] the need to accommodate two statutes, when both were adopted as part of a pattern of labor legislation." 353 U.S. at 42.  In other

words, the Norris-LaGuardia Act is simply construed in pari materia with other labor statutes.

The Pittsburgh Railroad opinion does say that the "prohibition of the NLGA must give way when necessary to enforce a duty specifically imposed by another statute," 491 U.S. at 513, but this was offered to explain the Court's precedent relating to reconciling the NLGA with other federal labor statutes that impose labor duties, including the Railway Labor Act, the NLRA, and the labor provisions of the Interstate Commerce Act ("ICA"). Id. The Pittsburgh Railroad opinion had no occasion to address the interaction of the NLGA with nonlabor statutes, and indeed as to the labor provisions of the ICA before it, concluded that it saw no conflict between the Norris-LaGuardia Act's ban on injunctions and the labor duties imposed under the ICA. Id. at 514.

Pulte is not a railroad. Pulte makes no claim that any other federal labor statute conflicts with the Norris-LaGuardia Act in this case.[23] Accordingly, this Court is still bound by the holding in the Crowe case, and the Supreme Court authority upon which it was based, that: the"'Norris-LaGuardia Act's ban on

---

[23] Pulte cites a Second Circuit case upholding a government injunction obtained under the RICO statute, but that merely proves the point—the Second Circuit concluded that the RICO statute was, for the purposes before it, a labor statute such that it could reconcile the competing labor directives of the Norris-LaGuardia Act and government injunctive authority under RICO in favor of sustaining the government injunction. Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, 965 F.2d 1224, 1238 (1992).

federal injunctions is not lifted because the conduct of the Union is unlawful under some other nonlabor statute.'" 713 F.2d at 214 (quoting Order of Railroad Telegraphers). [24] In Crowe this Court unambiguously declared: "We are unwilling to modify or abandon the declared congressional purpose of the anti-injunction provisions of the Norris-LaGuardia Act." 713 F.2d at 214. This holding has currency today.

Pulte attempts to support its position by offering a quote from the First Circuit's opinion in Tejidos De Coamo, Inc. v. Intl'l Garment Workers Union, 22 F.3d 8 (1st Cir. 1994) allegedly noting that unlawful, non-violent conduct may be enjoined under the Act. Opening Brief, at 41. Pulte, however, ignores the pertinent caveat identified by the First Circuit that is directly applicable here: that *"no matter what threats or harms are presented, section 4-except as limited by the Supreme Court--creates an unqualified 'no injunction' zone for the core conduct"* listed therein. Id. at 14 (emphasis added). Acknowledging that the authority of

---

[24] In fact, subsequent to the Pittsburgh case, this Court, citing Crowe, held that a district court lacked jurisdiction under the Act to issue a consent decree involving a civil rights claim because the decree would have impaired the "Unions' ability to exercise their economic power in the underlying labor dispute." Armco v. United Steelworkers of America, 280 F.3d 669, 681 (6th Cir. 2002).

courts has grown since the 1930s, the First Circuit nonetheless conceded "the authority to repeal statutes still belongs to Congress." Id. at 15.[25]

Undaunted by adverse precedent, Pulte offers a series of suggestions about how the Act's prohibitions on injunctions could be reconciled with, or be superseded by, the CFAA. Opening Brief, at 22-33.[26] All of these suggestions, made for the first time on appeal, are predicated upon the unsound legal assumption that any unlawful activity—including any activity that violated the CFAA—is sufficient to overcome the jurisdictional limitations of section 104 of the Act.

In so many words, Pulte asks this Court to get back into the judicial business of intervening in labor disputes based upon general notions of "unlawful" conduct-- the historical raison d'etre of the Norris-LaGuardia Act in the first place. That battle was fought and lost in the legislative history of the Act. Now, 78 years later, Pulte wants to amend the text of subsections 104(e) and (f) to add the language unsuccessfully offered by Congressmen Beck that "after the word 'acts'

---

[25] In Tejidos, the First Circuit considered whether an injunction for conduct outside of section 4's "no injunction" zone could be issued under section 7 for conduct which was unlawful but not violent. 22 F.3d at 14. Tejidos held, however, that the prerequisites of section 7 were not present. Id.

[26] Inexplicably, Pulte cites to a Fifth Circuit case, Scott v. Moore, 680 F.2d 979 (5th Cir. 1982) (en banc), rev'd on other grounds, 463 U.S. 825 (1983), as authority for issuing an injunction under the NLGA even though this Court, in Crowe , distinguished Scott as involving violence not within the protection of the NLGA. Crowe, 713 F.2d at 214 (distinguishing Scott). See Opening Brief, at 40.

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 45

in section 4 . . . insert the following: 'Except where said acts are performed or threatened for an unlawful purpose or with an unlawful intent, or are otherwise in violation of any statute of the United States.'" 72 Congressional Record 5507 (March 8, 1932).

Accordingly, the issue is not whether the Norris-LaGuardia Act is a "general" statute as opposed to the allegedly more "specific" CFAA, nor the order in which the statutes were enacted, nor whether one impliedly repealed the other. Instead, the question is does the labor dispute subject matter of this controversy deprive the District Court of jurisdiction to issue injunctions "except in strict conformity with" the NLGA. 29 U.S.C. § 101 (emphasis added). It does.

Nor does it matter that the CFAA has its own provision for the issuance of injunctions. 18 U.S.C. § 1030(g). In the Crowe case, this Court confronted the equally express statutory authorization of the Bankruptcy Code for the automatic issuance of a stay, and held that it could not overcome the jurisdictional ban of the Norris-LaGuardia Act on the issuance of injunctive relief. 713 F.2d at 215. Other circuit courts are in agreement. Marine Transport Lines, Inc. v. Int'l Organization of Masters, 770 F.2d 1526, 1530 (11th Cir. 1985) (following Crowe); Briggs Transportation Co. v. Int'l Brotherhood of Teamsters, 739 F.2d 341, 343 (8th Cir. 1984) (following Crowe); Petrusch v. Teamsters Local 317, 667 F.2d 297 (2nd Cir. 1981) (cited and followed in Crowe).

Finally, while Pulte has not alleged or proven any basis for disregarding the injunction immunity of the Act, this would be an inappropriate case in which to do so. As previously discussed, section 104(e)'s immunity for publicizing a labor dispute is expressly qualified by a "fraud or violence" exception. The statute invoked by Pulte—the CFAA—has a particular provision addressing computer crimes with "intent to defraud," 18 U.S.C. § 1030(a)(2)(4), but it has not been pled by Pulte. Hence, Pulte has not even alleged the specific fraud under the CFAA which, if the CFAA had to be harmonized with the Norris-LaGuardia Act, could possibility overcome the Norris-LaGuardia Act's immunity for publicizing a labor dispute.

### 5. There is No Allegation Or Clear and Convincing Proof that Any Defendant Committed, Authorized, or Ratified Any Violent or Fraudulent Act

The history of conflict which gave rise to the Act included the judicial enforcement of employers' use of criminal prosecutions, conspiracy claims (especially under the Sherman Act), and labor injunctions against labor leaders to thwart employee efforts to unionize. See Brotherhood of Maintenance of Ways Employees v. Guilford Transportation Indus., 803 F.2d 1228, 1230-33 (1st Cir. 1986). In response, Congress included in section 5 of the Act a prohibition on federal court jurisdiction to issue injunctive relief "upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an

unlawful combination or conspiracy because of the doing in concert of the acts

enumerated in section 104 of this title." 29 U.S.C. § 105. In addition, section 6

prohibits holding a union, union officer, or union member "responsible or liable"

for "the unlawful acts of individual officers, members, or agents, except upon clear

proof of actual participation in, or actual authorization of, such acts, or ratification

of such acts after knowledge thereof." 29 U.S.C. § 106. "'Clear proof' means

proof which is clear, unequivocal, and convincing." United Steelworkers v. Lorain,

616 F.2d 919, 921 (6th Cir. 1980) (quoting § 106).

Here, there is no allegation, or evidence that any Defendant engaged in,

authorized, or ratified, any fraudulent or violent act. At the hearing, the District

Judge directly asked plaintiff's counsel: "You are saying that these calls, these

threatening phone calls and these obscene calls, you can trace to the defendants?"

(RE 22, at 15 l). Plaintiff's counsel's response was: "We can trace to something

they have authorized and ratified because they put on their website this call to

action, okay?" Id. This is no evidence that the Defendants were responsible for

any obscene or threatening phone calls, much less the clear and convincing proof

required under the Norris-LaGuardia Act to attribute liability to a union or union

official for misconduct. 29 U.S.C. § 106.

Pulte erroneously asks this Court to apply traditional agency principles to

attribute responsibility to these Defendants for these few anonymous phone calls,

rather than the clear and convincing standard imposed by the NLGA. Opening Brief, at 45 & n.11 (citing § 106 of the NLGA but then citing a case under the Taft-Hartley Act, In American Bridge Div. v. Int'l Union of Operating Eng'rs, 772 F.2d 1547 (11th Cir. 1985)).[27]   Pulte's suit, however, was not brought under the Taft-Hartley Act or its agency principles.

Congress provided in section 106 of the NLGA a more restrictive standard for attribution of liability for injunction proceedings than that applicable under the Taft-Harlety Act. See, e.g., Carbon Fuel Co. v. UMW, 444 U.S. 212, 217 & n.6 (1979) (describing different agency principles under NLGA and the Taft-Hartley Act). Pulte has made no showing that these Defendants were responsible for any of the allegedly offending anonymous telephone calls. Pulte cannot satisfy even the less stringent standard of common law agency, much less the more restrictive standard of the NLGA. Id. (quoting with approval Senator Taft's comments on less stringent agency standard for Taft-Hartley Act that a wife's receipt of a lot of telephone messages insufficient to prove they came from union).

## II. Even if Section 107 of the Act Applied, Pulte Has Not Met Its Heavy Burden to Justify Injunctive Relief Thereunder

---

[27] The only other case cited by Pulte also does not involve § 106. Portland Pressman's Union v. Oregonian Pub. Co., 188 F.Supp. 859 (D. Or. 1960), affirmed on labor preemption grounds, 296 F.2d 4 (9th Cir. 1960).

Even if Pulte could overcome the injunction immunities set forth in sections 101, 102, and 104 of the Norris-LaGuardia Act, it cannot possibly satisfy the stringent statutory preconditions to the issuance of injunctive relief. To obtain a preliminary injunction, a movant must establish a likelihood of success on the merits, irreparable injury, that public interest is served by an injunction, and the potential harm to plaintiff outweighs that to the defendant. Op. at 2 (citing Sandison v. Michigan High School Athletic Ass'n, 64 F.3d 1026, 1030 (6th Cir. 1995)).

In addition, under the NLGA, a movant must also demonstrate, at an evidentiary hearing, including that: (i) unlawful acts have been committed and are threatened but an injunction may issue only against the person or organization making the threat; (ii) substantial and irreparable injury will follow; (iii) that movant will face greater injury from denial of an injunction than would his adversary would from issuance of an injunction; and (iv), movant has no adequate remedy at law. 29 U.S.C. § 107. Furthermore, plaintiff must have exhausted "every reasonable effort to settle such dispute." 29 U.S.C. § 108. Pulte has not satisfied any of these burdens.

### A. Plaintiff is Not Likely to Succeed on its CFAA Claim

The Complaint alleges two separate types of violations of the CFAA: (1) the "unauthorized transmission of . . . information which intentionally caused damages

49

Case: 09-2245     Document: 33-1     Filed: 01/19/2010     Page: 50

to . . . Pulte's computer," allegedly in violation of 18 U.S.C. § 1030(a)(5)(i); and (2) obtaining unauthorized access to Pulte's computers and intentionally causing damage to Pulte's computer, allegedly in violation of 18 U.S.C. § 1030(a)(5)(ii). Complaint, ¶¶ 50, 51. Plaintiff failed to establish a likelihood of success on these claims.

At the hearing, the District Court pressed plaintiff's counsel on what basis Pulte was claiming that Defendants' obtained access to Pulte's computers. In response, Pulte's counsel admitted that "We are not saying that they weren't authorized to send e-mails," but claimed that Defendants had "exceeded their authorized access." RE 22, at 9.[28] But the CFAA defines the statutory phrase "exceeds authorized access" as : "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." § 1030(e)(6) (emphasis added). This statutory definition thus identifies the harm from access that the statute seeks to reach—the unauthorized <u>obtaining</u> or <u>altering</u> of information in the computer. There is no allegation in the Complaint that anyone sending an email to Pulte obtained or

---

[28] But, "[ A] violation for accessing 'without authorization' occurs only where initial access is not permitted.' <u>Shamrock Foods Co. v. Gast,</u> 535 F. Supp.2d 962, 967 (D. Ariz. 2008) (quoting <u>Diamond Power Int'l, Inc. v. Davidson</u>, 540 F. Supp.2d 1322, 1343 (N.D. Ga. 2007)). By admitting that Pulte had authorized the sending of the emails, Pulte was admitting that there was no violation of this subsection.

altered information within Pulte's computers. An email sender does not "obtain" information from Pulte's computers, nor does he "alter" information on them. In addition, merely sending a text email does not provide the sender with access sufficient to alter or obtain information in the computer. Role Models America, Inc. v. Jones, 305 F. Supp.2d 564, 566-67 (D. Md. 2004) (mere receipt of information by email does not constitute obtaining access to computer).

On the transmission claim, Pulte claims that Defendants acted "with the specific intent to disrupt Pulte's business," RE, at 7 but that is not sufficient even to state a claim. Section 1030(A)(2)(b) makes it a criminal offense to "knowingly cause the transmission of . . . information. . . and as a result of such conduct, intentionally causes damages without authorization." § 1030(a)(5)(A)(i)). This language clearly requires an allegation and proof that a defendant "knowingly" cause the transmission, and that this knowing transmission "intentionally cause[]," damages "without authorization." The "damages" which are the subject of this provision are narrowly defined as: "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).[29] There is no allegation or proof that Defendants actually caused any such impairment to Pulte's

---

[29]    The CFAA has an alternate definition for "loss," but the Complaint failed to allege loss. Cf. 18 U.S.C. § 1030(e)(11) with Complaint, ¶¶ 50, 51 (conclusorily alleging damages but not loss),

51

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 52

computers, much less intentionally caused, any such damage to Pulte's computer. Complaint, ¶¶ 46-51.[30]

There is also no allegation in the Complaint that these Defendants or any email sender had knowledge about the robustness of Pulte's email system. Hence there is no basis for any inference that Defendants intentionally caused damages without authorization. Pulte's concession that it authorized the receipt of the emails (RE No. 22, at 9), undermines any argument that anyone caused damages "without authorization" by merely sending an email to Pulte. Because equitable jurisdiction is restricted to pled allegations, 29 U.S.C. § 109, the absence of any pleading allegation of impairment to the integrity or availability of data or information as a result of any email is also fatal to the CFAA claim for injunctive relief.

## B. Plaintiff is Not Likely to Succeed on its State Law Claims

Pulte is unlikely to success on its state law claims because they are dependent on the discretionary exercise of supplemental jurisdiction, which would be disfavored under these circumstances. American Family Mutual Insurance Co.

---

[30] Pulte's brief alleges—without record citation because there is no record support—that Pulte was "forced" to hire a consultant to diagnose if there was any computer interruption or damage. Opening Brief, at 19. This was neither pled nor argued below, violates this Court's procedural default rules, and violates the procedural requirements of the Act, including pleading requirements of section 109 and the cross-examination requirements of section 107.

v. Rickman, 554 F. Supp.2d 766 (N.D. Ohio) (declining to exercise supplemental jurisdiction over state law claims once CFAA claim dismissed). See 28 U.S.C. § 1367.

The trespass to chattel claim is unlikely to succeed because, as Pulte conceded below, applicable Michigan law requires a showing of "a wrongful exercise of dominion or control over plaintiff's property." Ansley v. Conseco Financial Servicing Corp., 2002 Mich. App. Lexis 2033 (2002) (cited by Pulte) (upholding trespass to chattel claim of mobile home resident who was wrongfully deprived of missing personal property after finance company locked her out of mobile home). Plaintiff has not pled an essential element of a trespass to chattel claim (dominion or control), and it is unlikely that merely sending emails could constitute dominion or control as a matter of law. There is no Michigan case holding that a mere email communications can constitute a trespass to chattel. In similar circumstances, the Second Circuit has declined to exercise supplemental jurisdiction over a trespass to chattel claim under New York law because it was an unsettled question of state law. Sherwood 48 Associates v. Sony Corp. of America, 76 Fed. Appx. 389 (2nd Cir. 2003).

Similarly, the tortious interference with prospective business opportunity claim is unlikely to succeed because the Complaint fails to identify any lost opportunity. See, e.g., Fielder v. Greater Media, Inc., 2006 WL 2060404, *4

(Mich. App. July 25, 2006) (dismissing complaint for failure to identify lost opportunity). Furthermore, the failure to allege a specific lost opportunity in the Complaint triggers the prohibition of the NLGA which limits injunctions to matters which are "expressly complained of in the bill of complaint." 29 U.S.C. § 109.

The conspiracy claim is unlikely to succeed for lack of a tort. Hetherington v. Great Lakes Orthopaedic Center, PC., 2009 WL 691873 (Mich. App. March 17, 2009) ("Because plaintiff failed to establish an underlying tort, his conspiracy claim fails as a matter of law."). Further, section 105 of the Act would preclude issuance of any injunction based upon allegations of conspiracy to engage in immunized activity under section 104.

## C. The Remaining Factors Favor Denial of Equitable Relief

The emails directly addressing an ongoing labor dispute fall within the protection of both federal labor law (the NLGA and the NLRA) and the First Amendment. See, e.g., Chamber of Commerce, 128 S. Ct. at 2413-14 (noncoercive speech about unionization protected by section 8(c) of the NLRA and the First Amendment). Indeed, both the medium and the message[31] (the Internet[32] and labor speech) enjoy First Amendment protection.

---

[31] See, e.g., Complaint, at ¶ 26 ("The emails also contained false information, repeating the erroneous conclusion that" Pulte's employees were terminated for wearing a LIUNA t-shirt.).

Because the speech at issue is constitutionally protected, the burden falls

heavily upon Pulte to justify any injunction against further speech.  County Sec.

Agency v. Ohio Department of Commerce, 296 F.3d 477, 485 (6th Cir. 2002)

(preliminary injunction against future speech must meet higher burden applicable

to prior restraints: "publication must threaten an interest more fundamental than the

First Amendment itself.").   Furthermore, where First Amendment rights are at

stake, the public interest favors the protection of those rights.  Each sender of an

email makes an individual determination as to whether they want to speak, to

whom, and the content of their communication.   All of these decisions and acts lie

at the core of the values protected by both the First Amendment and federal labor

law.

### D. Pulte Has Not Met Its Statutory Burden of Exhausting Every Reasonable Effort to Settle Prior to Seeking Injunctive Relief

Under the Act, Pulte must prove that it made "every reasonable effort to

settle such dispute either by negotiation or with the aid of any available

governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108.

See generally Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western

Railroad, 321 U.S. 50 (1944) (failure to make reasonable effort to arbitrate

precluded injunctive relief under NLGA); Int'l Ass'n of Machinists v. Eastern Air

---

[32]  Doe v. Cahill, 884 A.2d 451, 456 (Del. 2005) (internet communications subject to First Amendment)..

Lines, Inc., 121 B.R. 428, 435-36 (S.D.N.Y. 1990) (Sand, J) (citing Toledo, airline's failure to exhaust arbitration required denial of injunction under "clean hands" provisions of section 8 of NLGA, even against violence otherwise subject to section 7), aff'd, 923 F.2d 26 (2d Cir. 1991) (citing Toledo).

Here, the sum total of Pulte's efforts to settle this dispute is the pre-filing letter from its General Counsel in which he demands that LIUNA "cease encouraging this activity and use every means available to you to put an end to this activity." GC Letter. This letter does not mention any computer malfunction or damage at Pulte, and it does not even cite the CFAA. Id. Instead, the letter complains about allegedly "defamatory" statements being made by LIUNA "that Pulte unlawfully terminated employees for engaging in union activity." Id. Pulte's General Counsel was literally demanding that LIUNA suppress ("put an end to this activity") the free speech of its members and supporters, in derogation of their constitutional and statutory speech rights. This is not a reasonable effort to settle a dispute.

Pulte filed this lawsuit, along with an ex parte application for a TRO and preliminary injunction, on Tuesday, September 15th, less than forty-eight hours after this Sunday letter from its General Counsel. Where, as here, the facts are undisputed, whether movant has made "every reasonable effort" to settle a dispute for purposes of section 108 is a question of law. Grand Trunk Western R.R. v.

Brotherhood of Maintenance of Way Employees, 497 F.3d 568, 572 (6th 2007)

(months of negotiations, unsuccessful mediation, sufficient effort). Whatever else

the General Counsel's letter was, it hardly satisfied Pulte's statutory requirement of

making "every reasonable effort" to settle this matter. Indeed, Pulte's efforts

would be an insufficient foundation for launching a discovery dispute. Cf. In re

Johnson, 408 B.R. 115 (Bkr. S.D. Ohio 2009) (denying discovery motion for lack

of good faith attempt to resolve dispute).

## III.   The Labor Dispute Activity At Issue is Subject to Labor Preemption

Before this suit was filed, LIUNA had filed unfair labor practice charges

against Pulte before the NLRB, and on Friday, September 11th, the Board's

Regional Director notified Pulte that the Board would conduct expedited

proceedings and that the Board might seek a preliminary injunction against Pulte,

RE No. 6, Exs. 1 & 2, and the Board thereafter filed unfair labor practice charges

against Pulte. Under longstanding federal law, suits over labor activity that is

actually or even arguably protected or prohibited under the labor laws are subject

to preemption in favor of the primary jurisdiction of the NLRB.[33]

---

[33] The Supreme Court has noted that the statutory term "labor dispute" for
purposes of the Norris-LaGuardia Act is "virtually identical" to the term as used in
the NLRA. Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n, 457
U.S. 702, 711 n.11 (1982.

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 58

The two types of labor preemption applicable here are <u>Garmon</u> preemption,

pursuant to <u>San Diego Building Trades Council v. Garmon</u>, 359 U.S. 236 (1959),

and <u>Machinists</u> preemption, pursuant to <u>Machinists v. Wisconsin Employment</u>

<u>Relations Commission</u>, 427 U.S. 282 (1976).   The District Court did not address

labor preemption its ruling and this issue is still pending before that Court, but this

Court can affirm the District Court's ruling on preemption grounds if supported in

the record.

As previously discussed, the labor speech at issue is actually protected

under the federal labor laws.   Specifically, the NLRA expressly protects the

"expressing of any views, argument, or opinion or the dissemination thereof,

whether in written, printed, graphic, or visual form" as long as it is "without threat

of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).   <u>See, e.g.,</u>

<u>Chamber of Commerce</u>, 128 S. Ct. at 2413-14 (2008) (§ 8(c) implements the First

Amendment and manifests Congressional intent to encourage free debate on labor

issues).   Pulte did not contend below that section 8(c) was inapplicable to the

speech at issue.

The Supreme Court's recent <u>Chamber of Commerce</u> opinion explicitly held

that "the addition of § 8(c) [to the NLRA in 1947] expressly precludes regulation

of speech about unionization." <u>Id</u>. (emphasis added).   Hence, organizing speech

Case: 09-2245   Document: 33-1   Filed: 01/19/2010   Page: 59

clearly falls within the <u>Machinists</u> preemption doctrine, section 8(c) of the NLRA, and section 7 of the NLRA.

While in some circumstances, federal courts take into consideration the countervailing interests of state law when evaluating labor preemption, that is not the case when the labor activity at issue is actually protected under federal labor law. <u>See, e.g.</u>, <u>Brown v. Hotel and Restaurant Employees and Bartenders Int'l</u>, 468 U.S. 491, 501 (1984) (citing <u>Garmon</u>). Hence, Pulte's state law claims are preempted under both the <u>Garmon</u> and <u>Machinists</u> doctrines.

In <u>Chamber of Commerce</u>, the Supreme Court expressly held that Congress left no doubt whether it intended section 8(c) to have pre-emptive effect on state and federal regulation of labor speech. 128 S. Ct. at 2414 ("The explicit direction from Congress to leave noncoercive speech unregulated makes this case easier, in at least one respect, than previous NLRA cases because it does not require us to 'to decipher the presumed intent of Congress in the face of that body's steadfast silence.'") (quoting and citing <u>Sears</u>, 436 U.S. at 188 n.12). The <u>Chamber of Commerce</u> opinion noted that the Court had "characterized <u>Machinists</u> pre-emption as 'creat[ing] a zone free from all regulations, whether state or federal.'" <u>Id</u>. at 2417 (quoting <u>Building and Constr. Trades Council v. Associated Builders & Contractors of Mass.</u>, 507 U.S. 218, 226 (1993)). Like the "injunction-free zone"

created by the NLGA, section 8(c) creates a regulation-free zone for noncoercive unionization speech.[34]

The Chamber of Commerce opinion squarely holds that: "In the case of noncoercive speech, however, the protection [of the NLRA] is both implicit and explicit." 128 S. Ct. at 2414 (emphasis added). The Court identified section 8(c) as an express protection by Congress "of free debate [that] forcefully buttresses the pre-emption analysis in this case," because it "expressly precludes regulation of speech about unionization." Id. In other words, this is the very type of "'compelling congressional direction'" that makes the preemptive effect of the NLRA evident over any contrary law of general application. New York Telephone Co. v. New York State Department of Labor, 440 U.S. 519, 540 (1979) (quoting Garmon).

Likewise, the Garmon and Machinists preemption doctrines apply equally to federal law. As to Machinists preemption, the Chamber of Commerce opinion explained that another federal statute "will contract the pre-emptive scope of the NLRA if it demonstrates that 'Congress has decided to tolerate a specific measure of diversity' in the particular regulatory sphere." 128 S. Ct. at 2418 (quoting New York Telephone Co, 440 U.S. at 546). In other words, the pre-

---

[34] Coercive speech is both prohibited (and arguably prohibited) and thereby subject to regulation by the NLRB. See, e.g., DTR Industries, Inc. v. NLRB, 297 Fed. Appx. 487 (6th Cir. 2008).

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 61

emptive scope of the NLRA can be contracted by another federal statute, but only if that statute is a "tailored exception" to the NLRA which does not conflict with it. There is no statuory indicia that Congress intended that the CFAA contract the preemptive scope of the NLRA, or that it should be considered an exception to the NLRA.

This Circuit has instructed that "federal district courts may enforce congressional remedies created by a different federal statute so long as the statute does not conflict with §§ 7 and 8 of the NLRA and so long as litigants 'do not circumvent the primary jurisdiction of the NLRB. . . ." Trollinger v. Tyson Foods, 370 F.3d 602, 610 (6th Cir. 2004). Here, application of the federal computer civil remedies invoked by Plaintiff would directly violate §§ 7 and 8 of the NLRA by purporting to regulate core protected "unionization speech," in derogation of the Chamber of Comerce opinion, and the Garmon/Brown line of precedent.

## IV. The Application of Section 1030 to Criminalize Constitutionally Protected Labor Speech Renders It Substantially Overboard and Invalid

Pulte asks this Court to hold that the CFAA supersedes the statutory protections for labor speech and assembly codified in the Act and the NLRA, which implement the corresponding First Amendment guarantees, all based upon its claim that the CFAA—a statute addressing computer hacking--must be given hegemony over these fundamental statutory and constitutional rights. This is not

Case: 09-2245    Document: 33-1    Filed: 01/19/2010    Page: 62

a balance that would be familiar to, or welcomed by, the Founding Fathers who placed these rights within the First Amendment, nor the Congresses which created successive statutory firewalls between labor dispute participants and federal courts. This conclusion is reinforced by the overlapping constitutional principles and statutory construction doctrines that apply in this labor speech context, including the First Amendment,[35] and the doctrines of constitutional avoidance,[36] fair warning,[37] overbreadth,[38] prior restraint,[39] and lenity.[40]  Ignoring all of these constitutional and prudential restraints, Plaintiff asks this Court to construe the CFAA as criminalizing the transmission of emails containing speech otherwise

---

[35]  Chamber of Commerce, 128 S. Ct. at 2413.  See also  NAACP v. Claiborne Hardware Co., 458 U.S. at 915 (nonviolent elements of speech and boycott activities entitled to First Amendment protection).

[36]  Edward J. DeBartolo Corp., 485 U.S. at 575 (1988) (to avoid First Amendment conflict, construing NLRA to permit peaceful handbilling).

[37]  LRVCC Holdings LCC v. Brekka,  581 F.3d 1127, 1134 (9th Cir. 2009) (applying fair warning doctrine to construe CFAA narrowly) (citing United States v. Santos, 128 S. Ct. 2020, 2025 (2008). See United States v. Lanier, 520 U.S. 259, 265 (1997) (due process requires fair warning, citing United States v. McBoyle, 283 U.S. 25, 27 (1931) (Holmes, J.)).

[38]  Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).

[39]  Alexander v. United States, 509 U.S. 544, 550, 552 n.3 (1993); County Sec. Agency v. Ohio Department of Commerce, 296 F.3d at 485 ("One type of prior restraint is a judicial order 'forbidding certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and preliminary injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints.'") (quoting Alexander).

[40]  Brekka,  581 F.3d at 1134.

protected by the First Amendment and federal labor law.  Such a construction of
the CFAA would surely doom it as substantially overbroad under the First
Amendment.

The Supreme Court held long ago that: "the dissemination of information
concerning the facts of a labor dispute must be regarded as within that area of free
discussion that is guaranteed by the Constitution." Thornhill, 310 U.S. at 102-03
(reversing conviction of union president for picketing).   It is because the speech at
issue is protected by both the labor laws and the First Amendment that section
1030 should not be construed in such a manner as to criminalize such speech.  See,
e.g., Edward J. DeBartolo Corp., 485 U.S. at 575 (to avoid First Amendment
conflict, construing NLRA as authorizing peaceful labor handbilling at shopping
mall); Storer Communications, Inc.., 854 F.2d at 147 (if handbilling protected,
peaceful warnings of intent to handbill protected).  See also 29 U.S.C. §§ 104(e),
(g).

If, on the other hand, section 1030 encompasses and proscribes
noncoercive protected labor speech, it is substantially and constitutionally
overbroad. Thornhill, 310 U.S. 88 (1940) (anti-picketing statute overbroad because
did not take account of nature of labor dispute, or its restrained character).[41]  The

---

[41] See City Council v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984) (identifying
Thornhill opinion as source of overbreadth doctrine).

overbreadth doctrine is triggered by "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973). Here, because the method of speech employed— email messages send to an authorized e-mail address—is itself protected by the First Amendment, the fact that these emails contain, disseminate, and publicize protected noncoercive communications under the NLGA and sections 7 and 8(c) of the NLRA as part of a labor dispute, virtually compels the conclusion that section 1030 sweeps too broadly if it criminalizes such speech. Such a broad application of section 1030 will chill broad swaths of protected speech or expression. Again, because this speech is constitutionally protected labor speech, giving a participant to a labor dispute the unilateral discretion and authority to civilly prosecute his labor adversary for such speech can only be characterized as the work of an overbroad statute.

### V. The Labor Activity At Issue Is Immune from Liability Under the Norris-LaGuardia and Clayton Acts

In 1914, Congress first enacted protections under the Clayton Act against the use of federal laws against labor unions, and it was the perceived judicial failure to implement these labor protections which gave birth to the Norris-LaGuardia Act of 1932. Specifically, section 20 of the Clayton Act, codified at 15 U.S.C. § 52,

64

Case: 09-2245     Document: 33-1     Filed: 01/19/2010     Page: 65

provided that certain labor activity was immune from injunctive relief, but
concluded that "Nor shall any of the acts specified in this paragraph be considered
or held to be violations of any law of the United States." Id. Subsequently, in
United States v. Hutcheson, 312 U.S. 219 (1941), the Supreme Court, per Justice
Frankfurter, dismissed an antitrust indictment on the ground that the activity at
issue (a secondary boycott) fell within the scope of activity protected under the
Norris-LaGuardia Act, and the Clayton Act. Id. at 231-34. In particular, the
Hutcheson opinion gave these "interlacing statutes" the broad construction to
which Congress intended by passage of the Norris-LaGuardia Act. Specifically,
Justice Frankfurter stated for the Court:

> But to argue, as it was urged before us, that the Duplex opinion still governs
> for purposes of a criminal prosecution is to say that which on the equity side
> of the court is allowable conduct may in a criminal proceeding be the road
> to prison. . . . That is not the way to read the will of Congress, particularly
> when expressed by a statute which, as we have already indicated, is
> practically and historically one of a series of enactments touching one of the
> most sensitive national problems. Such legislation must not be read in a
> spirit of mutilating narrowness.
> Hutcheson, 312 U.S. at 234-35.

In so holding, the Supreme Court construed the broad immunity created
from injunction by the Clayton Act, as reaffirmed by Norris-LaGuardia Act, as
creating an immunity from criminal prosecution for such activity. Here, Pulte is
contending that activity which it claims constitutes criminal violations of the
CFAA, are the basis for not only its federal claim but its injunction requests.

Accordingly, because defendants' actions are shielded from injunctive relief under

the Norris-LaGuardia Act as nonviolent, and non-fraudulent labor speech, they are

equally immunized from prosecution as a federal law violation under the

provisions of § 52 of title 15 which prohibit such conduct from being "considered

or held to be violations of any law of the United States." Id.

## Conclusion

For the foregoing reasons, the District Court should be affirmed.

Respectfully submitted,

s/Terrance G. Reed
Terrance G. Reed
LANKFORD & REED, PLLC
120 N. St. Asaph Street
Alexandria, VA 22314
703-299-5000


Christopher P. Legghio
MARTENS, ICE, KLASS, LEGGHIO &
ISRAEL, P.C.
306 South Washington Avenue
Suite 600
Royal Oak, MI 48673
248-398-5900


Counsel for Defendants-Appellees

**ADDENDUM-1**

**DESIGNATION OF**
**RELEVANT DISTRICT COURT DOCUMENTS**

| RE # | DATE | DESCRIPTION |
|---|---|---|
| 1 | 9/15/2009 | Verified Complaint and Jury Demand |
| 2 | 9/15/2009 | Plaintiff-Appellant's ***Ex Parte*** Motion for Temporary Restraining Order and Preliminary Injunction |
| 6 | 9/16/2009 | Defendants-Appellants' Response to Plaintiff-Appellant's Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction |
| 9 | 9/16/2009 | Memorandum Opinion and Order denying request for Temporary Restraining Order |
| 13 | 9/21/2009 | Plaintiff-appellant's Supplemental Brief in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction |
| 14 | 9/24/2009 | Order Denying Motion for Preliminary Injunction |
| 15 | 9/29/2009 | Plaintiff-Appellant's Notice of Appeal |
| 22 | 10/15/2009 | Transcript of September 22, 2009 Motion Hearing |

# **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P.32(a) and 6th Cir. 32(a), I hereby certify that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) in that it contains:  (i)  13, 994 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word. 2007 in 14-point Times New Roman.

_____
Terrance G. Reed

CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2010 I electronically filed this CORRECTED OPPOSTION OF BRIEF OF DEFENDANT-APPELLEES AND THIS CERTIFICATE OF SERVICE with the Clerk of the Court using ECF system.  Notice of this filing will be sent to the parties listed below by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

John F. Birmingham, Jr.
Foley & Lardner, LLP
500 Woodward Avenue, Suite 2700
Detroit, MI  48226-3489
jbirmingham@foley.com

/s/ _Terrance Reed_

Terrance G. Reed